1

T.S. HARTZELL

2  239 N. Meyer Avenue
   Tucson, Arizona 85701

3  (520) 792-8181
   Arizona State Bar # 013862

4  Pima County Computer # 64555
   tshartzell@tshartzell.com

5  Attorney for Defendant

6            IN THE UNITED STATES DISTRICT COURT

7                   DISTRICT OF ARIZONA

8  United States of America,        )
                                     )        4:24-CR-01182-AMM-MAA
9               Plaintiff,           )
                                     )
10  vs.                              )        DEFENDANT'S SENTENCING
                                     )        MEMORANDUM
11  Brian Thomas Balda,              )
                                     )
12              Defendant.           )
   ─────────────────────────────    )

13

14        Brian Balda, through counsel, submits the following memorandum to assist the Court at

15  the time of sentencing.

    The Offenses

16        The government, through speculation, intimation and near-fabrication, has painted a

17  scenario in which Balda, armed and dangerous, was hurtling towards a confrontation with the

18  victim at his residence in Tucson. The government's mise-en-scène ignores certain facts and

19  misconstrues others.

20        **Facts**

21     •  No evidence–not Balda's notebook nor his phone–suggests Balda had any idea

22        where the victim lived. In fact, Balda testified he never looked for nor knew the

23        victim's address.

24     •  Balda both told the police and testified at trial that he was driving to his sister's

25        house when stopped and arrested. Balda's location supports this fact as it was

26        much closer to his sister's house than it was to the victim's house.

27     •  Balda never made any threat to the victim. While his messages were rude and

28

1    often angry, the most worrisome said only "you should pay for what you did" and

2    "we need to have a chat".

3    •    The victim was in California at the time of Balda's arrest.

4    Turning, then, to the question of a weapons enhancement, the government focuses on the

5    four knives and the BB gun in the car at the time of the arrest.  Yet, the evidence suggests these

6    items were present in the car from before it left Oregon and were "possessed" during several

7    electronic communications.  In fact, it is quite possible, even likely, that Balda possessed one

8    or more knives every time he communicated with the victim.

9    The government can show no connection whatsoever between the knives and the BB gun

10    and either of the offenses.  Despite its oft-repeated and fearful insistence that Balda "could have"

11    harmed the victim, this suspicion is not proof of any intent to harm or scare the victim or that the

12    knives and BB gun had any role in these offenses.

13    As Mr. Balda argued in his objection to the presentence report, we are all of us in

14    possession of deadly weapons most of the time.  It was not sarcasm to point out that the

15    guideline definition of dangerous weapon, "an instrument capable of inflicting death or serious

16    bodily injury",[1] encompasses a motor vehicle, a lug wrench, and, with apologies to Colonel

17    Mustard, a candlestick in the library.

18    To elevate this unavoidable consequence of being, i.e., having possession of something

19    capable of inflicting death or serious bodily injury, into a deprivation of liberty requires proof

20    of a connection, somehow, to an offense.  Due process, that same due process required for

21    deprivation of liberty, does not allow a court to impose more time on a defendant for the

22    happenstance of having a rock, a knife or a letter opener close by when he or she is making a

23    harassing telephone call.

24    The two offenses–cyberstalking and interstate stalking–involved only verbal and written

25    communication, although the jury found that Balda traveled with the intent to harass the victim.

26    _____

27    [1] U.S.S.G. § 1B1.1, application note E.

28                                    2

None of these communications carried a true threat.  And even the government acknowledged in its closing argument that any intent to harass the victim could have been secondary to Balda's traveling to Tucson to deal with estate and trust problems.

The message that propelled the victim to request intervention, the one containing "It's a great day to DIE", was never intended for the victim and was sent by accident.  Semantically, it is obvious the message was written for Balda's sister, Anne Hoffmann, and that it referred to Balda's own death, not the victim's.

It also appears that the victim's recruitment of his son caused more, rather than less, apprehension.  The son's level of involvement did not become clear during trial; the PSR revealed to what degree the son took over protection of his father and how the actions that followed the son's involvement became those of a plural pronoun, and from D.D.'s fear to that of "the family".  It appears the son's fear and worry exacerbated his father's.

Brian Balda is not minimizing what he did or the pain that he caused.  His crimes are bad enough for what he actually did without spinning them into a scenario far beyond anything Balda intended.

The Offender

Brian Balda suffered mental and psychological defects, drug and alcohol use, a dysfunctional and abusive family, and a mysterious and convoluted personal origin, all which coalesced into an obsession of how he came to be.[2]  Brian was desperate to find someone who would claim him as his or her own and fixated on his memory of a generous United States

---

[2] Counsel's investigation into Brian Balda's family, attempting to find and convey some normalcy and assuage (to some degree) Mr. Balda's suspicions, found that Mr. Balda's seemingly outrageous beliefs are at least partially supported.  A genealogical study however, found that the victim and Mr. Balda are not blood-related.

senator sitting with the most unwanted boy in second grade.[3]

Psychologists who examined Balda at the Court's behest first concluded Balda was incompetent to stand trial and diagnosed a serious mental impairment requiring medication and resulting in paranoid delusions. The second psychologist found Balda competent, but diagnosed him as suffering a paranoid personality disorder with antisocial traits and a delusional disorder, persecutory type.

Brian Balda's downward spiral picked up with his mother's death, his sister's takeover of the family wealth, the discovery he had a half-brother with his first name, proof of his early adoption, all exacerbated by Balda's unregulated consumption of alcohol and methamphetamine. The mental and emotional distress and drug abuse culminated in the ten-month period of alternatively posing questions to the victim, making accusations and lashing out angrily at not getting the answers he wanted.

Balda quit drinking and using meth in January, 2024. He began attending twelve-step meetings and, as part of his recovery, wrote (but did not send) a note of apology to the victim, acknowledging his language and tone had gotten out of hand and his messages were abusive and bothersome. He thought he could rehabilitate his intercourse with the victim, oblivious to the extent of the dismay and disruption he caused.

With his newfound sobriety and sense of purpose, Balda came to Tucson to confront not the victim, but his sister Anne. While here, he believed conversations with the victim could provide insight into the mysteries of his origin, how he ended up with his family, and why the victim joined him for lunch in elementary school. Brian Balda now acknowledges that a reasonable person could conclude that any communication to or directed at the victim would be harassment.

---

[3] The kindness and graciousness of the victim are everywhere evident. From elementary school lunch, to initially talking to Balda, to the recommendations in the PSR, the selfless service of the victim speaks of a different and kinder time.

4

Balda's Criminal History

Brian Balda strenuously denies he was arrested as a juvenile and charged with armed robbery in 1986. He asserts he was living in Flagstaff that year and did not travel to Tucson. He has, since his arrest in this case, discovered that someone obtained a copy of his birth certificate from the Arizona Department of Health in 1986 and speculates his identity may have been compromised.

Balda's other run-ins with the law are typical of those with mental illness and substance abuse issues. Brian Balda realizes and accepts the lapses in judgment that led to the charges and convictions and is committed to maintaining his sobriety and treating any mental or emotional disorders.

Sentencing Factors

Brian Balda falls within U.S.S.G. § 5H1.3, a section providing for a downward departure in certain cases where mental and emotional conditions are present to an unusual degree. Whereas no other guideline sections seem applicable to Balda's unique circumstances, he points out that U.S.S.G. § 2A6.2 and the statute of conviction came from the Violence Against Women Act, and were brought about by the concerted efforts of women's groups to end domestic violence. A similar guideline section, § 2A6.1 which recommends sentences for threatening or harassing communication without the domestic violence connection, assigns an offense level of 12 to making harassing communications.

Brian Balda urges the Court to apply the advisory sentencing guidelines he argued for in his objections to the presentence report. At the same time, Balda recognizes the Court will sentence Balda to the sentence it believes reflects the seriousness of the offense, regardless of the ultimate advisory guideline offense level.

18 U.S.C. §3553(a) lists those factors, including the seriousness of the offense, that Congress insists the Court take into consideration. This offense began without any intention to harass the victim, but then became more. What sentence, then reflects the nature and circumstances of the offense? It was an offense of rudeness, lack of regard or consideration for

1    another's privacy and peace of mind.  As much as the Court is directed to look at what sentence

2    promotes respect for the law, it must also consider what might promote respect for normative

3    behavior, for thinking of how what one does impacts others.

4         What punishment is appropriate for saying rude, angry and mean things, repeatedly? How

5    much of the offense stemmed from untreated mental illness and how much came from *mens rea*?

6    Deterrence and the protection of the public both demand a sober and healthy Brian Balda.  While

7    general deterrence, what scares off a member of the public from committing another crime, often

8    focuses on penal consequences, specific deterrence–what prevents Brian Balda from committing

9    another crime–must focus on his physical and mental health.

10        Ultimately, the best sentence to accomplish these goals is a period of supervision with

11   substance abuse treatment and mental health monitoring and counseling.  This, too, would fit the

12   victim's recommendation.  Brian Balda seeks a sentence of time served and three years of

13   supervised release, including halfway house placement.

14   Conclusion

15        Brian Balda's angry and unjustified verbal attacks on a elderly, retired,  public servant

16   have brought him into this Court and kept him imprisoned for about 19 months.  Some of

17   Balda's messages were drunken rants; all the messages were prompted by paranoia and

18   suspicion.  None of the messages were actual threats, but almost all were caustic and unpleasant.

19        Brian Balda apologizes to the victim and his family and regrets he brought them so much

20   distress.  He welcomes the treatment the victim and his family recommend and asks the victim

21   advocate to convey to the family his apology and his sadness for what he did.

22        Dated August 28, 2025.

23                                        s/ T.S. Hartzell
                                         T.S. Hartzell,
24                                       Attorney for Brian Balda

25

26

27

28                                          6